AUSA: Kelly Fasbinder Telephone: (313) 226-9520
AO 91 (Rev. 11/11) Criminal Complaint Special Agent: Anna Korte Telephone: (313) 819-6338

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
Randon Williams

Case No.26-mj-30182

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2020 - March 2021 in the county of Wayne in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Monetray Transactions with Property from Unlawful Act |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Anna Korte, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: April 6, 2026

[signature]
*Judge's signature*

City and state: Detroit, Michigan

David R. Grand, Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Annamarie Korte, Special Agent with Internal Revenue Service, Criminal Investigations (IRS-CI), being duly sworn, state that:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint charging RANDON WILLIAMS (WILLIAMS) with wire fraud, in violation of 18 U.S.C. § 1343, and engaging in monetary transactions in property derived from specified unlawful activity with a value a value greater than $10,000, in violation of 18 U.S.C. § 1957.

2. I am a Special Agent with IRS-CI and have been since June 2024. I am presently assigned to the Detroit, Michigan Field Office. My responsibilities as a Special Agent include the investigation of criminal violations of the Internal Revenue Code, The Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, and the Money Laundering Control Act, 18 U.S.C. §§ 1956, 1957, and 1960.

3. As a Special Agent, I have completed training at the National Criminal Investigation Training Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I received extensive training in conducting financial investigations that involve analyzing the books and records of individuals and/or businesses, such as journals, ledgers, bank accounts, invoices, receipts, and other records evidencing violations of the Internal Revenue Code. I received training regarding Title 18,

United States Code (money laundering statutes) and Title 31, United States Code (Bank Secrecy Act statutes). Prior to entering IRS-CI, I worked for approximately two years in various financial and accounting roles.

4. The information in this affidavit is based on my personal observations, my training and experience, as well as information received from other IRS-CI special agents and employees, the United States Small Business Administration (SBA), and other reliable sources. This affidavit is submitted for the limited purpose of showing that there is sufficient probable cause to secure a criminal complaint and arrest warrant, and it does not set forth all my knowledge about this matter.

5. This investigation concerns false and fraudulent loan applications filed in relation to the COVID-19 pandemic. As described below, WILLIAMS knowingly devised and perpetrated a scheme or artifice to defraud lender financial institutions and the SBA. In furtherance of and to execute this scheme, WILLIAMS sent electronic loan applications and other writings, signs, signals, and pictures in interstate commerce by means of wire communication, as set forth below. He also received the proceeds of the loans via electronic funds transfer that crossed state lines. WILLIAMS also engaged in monetary transactions involving criminally derived property of a value greater than $10,000. All events referenced in this affidavit are alleged to have occurred on or about the date specified.

6. Considering the facts described below, as well as my training and experience, there is probable cause to believe that WILLIAMS has committed federal crimes, including but not limited to, violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. §1957 (Money Laundering).

7. 18 U.S.C. § 1343 criminalizes schemes or artifices to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises, when for the purpose of executing the scheme, the person transmits, or causes to be transmitted, any writings, signs, signals, pictures, or sounds by means of wire communication in interstate commerce.

8. 18 U.S.C. § 1957 makes it a crime to knowingly engage or attempt to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, through, or to a financial institution.

## BACKGROUND ON THE PAYCHECK PROTECTION PROGRAM

9. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020, designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program called the Paycheck Protection Program ("PPP").

10. To obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11. Completed applications are submitted by the borrower to an SBA participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA.

12. In or around January 2021, SBA began another round of funding for PPP applications and allowed borrowers who had already received a first draw PPP loan to request a second draw.

13. Additional verification was done by SBA for second draw PPP applications. The lender obtained necessary documents from the borrower such as, an application, supporting documents to support payroll costs, and documentation to prove a 25% reduction in revenues. The lender then reviewed these documents and submitted the information to the SBA for review and approval.

14. PPP loan proceeds must be used by the business on certain permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

15. PPP first draw and second draw applications were received through the SBA E-Tran server which is in Sterling, Virginia. PPP lenders disbursed the funds to the borrower. PPP lenders submitted disbursement details into the SBA E-Tran system located in Sterling, Virginia.

16. PPP Forgiveness applications are sent by the lenders to the SBA through a cloud-based platform called Summit through a server located in Oregon. SBA transmits the Forgiveness payments from SBA to the PPP lender through the FMS system to the Treasury. The primary server for FMS is in Sterling, Virginia.

17. Huntington National Bank (Huntington Bank) is an SBA participating lender and is insured by the Federal Deposit Insurance Corporation. As such, it is a financial institution as defined by 18 U.S.C. § 20.

## PROBABLE CAUSE

18. From approximately April 2020 through March 2021, WILLIAMS, using business entities that he created and controlled, submitted, and/or caused to be submitted, fraudulent applications for PPP loans totaling $5,200,611, and ultimately retained more than $4.4 million in loan proceeds. Based upon records discussed below, the loan applications fabricated or misrepresented the number of employees and the average monthly payroll expenses at each business. Furthermore, WILLIAMS falsely represented that the PPP funds would be used for payroll costs. Instead, the funds were largely used for WILLIAMS' personal benefit, including to purchase an approximately $235,000 Rolls-Royce Wraith, towards a downpayment on a more than $2 million dollar home, and to pay credit card bills.

### *The Romero Group – First Draw PPP Loan (April 20, 2020)*

19. According to incorporation documents filed with the Michigan Department of Licensing and Regulatory Affairs, The Romero Group was organized by WILLIAMS in or about August 2017. He was the registered agent. For the first two years after incorporation, the registered office address was the same address listed on WILLIAMS' Michigan driver's license. Surveillance conducted at the

address on March 24, 2026, shows it is a two-story townhouse located in a residential complex. There was no visible signage or other indication it was a business location. In January 2021, WILLIAMS changed The Romero Group's registered address to an office building in Bingham Farms, where it remains today.

20. The Romero Group has a social media presence and a website identifying the company as a design-build construction firm that offers both commercial and residential development and construction. The website displays purported before/after portfolio photos of work allegedly completed by the business.

21. On or around April 20, 2020, WILLIAMS submitted an SBA Form 2483 PPP Borrower Application to Huntington Bank on behalf of The Romero Group requesting a loan in the amount of $348,145. WILIAMS electronically signed the application and initialed various certifications and authorizations including that the information provided in the application and all supporting documents and forms were true and accurate in all material respects.

22. In the application, WILLIAMS listed himself as the Owner/President of The Romero Group with 100% ownership. The application also asserted The Romero Group had 21 employees, the average monthly payroll was $139,258, and the loan would be used for payroll.

23. A 2019 IRS Form 941 was submitted with the application and purported to show total quarterly payments of $415,344 made by The Romero Group to its 21

employees for January, February, and March, with $78,820.77 in federal income tax withheld. The 2019 IRS Form 941 was signed by WILLIAMS as CEO.

24. Based on the above representations, the loan was approved and, on or about April 23, 2020, $348,125 in loan proceeds were electronically disbursed into The Romero Group's bank account ending in x3425 at Huntington Bank.

25. Huntington Bank records show that WILLIAMS opened the business bank account ending in x3425 on December 21, 2018, titled for The Romero Group. WILLIAMS is the sole signor listed for the account. The account maintained a $400 balance from December 2019 through April 23, 2020, when the first draw loan proceeds were disbursed into the account.

***<u>The Romero Group – Second Draw PPP Loan (March 15, 2021)</u>***

26. On or about March 9, 2021, WILLIAMS submitted an SBA Form 2483-SD PPP Second Draw Borrower Application, on behalf of The Romero Group to Huntington Bank requesting a second loan in the amount of $348,145. WILLIAMS electronically signed the application and initialed various certifications and authorizations including that the information provided in the application and all supporting documents and forms was true and accurate in all material respects.

27. In the application, WILLIAMS listed himself as the Chief Executive Officer with 100% ownership. The application also asserted The Romero Group had 21 employees, the average monthly payroll was $139,258, and the loan would be

used for payroll. The application also reported The Romero Group earned $979,013 in gross receipts in the second quarter of 2019 and $704,889 in the second quarter of 2020.

28. Based on the above representations, the second draw loan was approved and, on or about March 9, 2021, $348,145 in loan proceeds were electronically disbursed into The Romero Group's bank account at Huntington Bank ending in x3425.

29. Bank records for the account ending in x3425 were obtained from Huntington Bank. An analysis of disbursement and withdrawal activity in the account during 2019 revealed total disbursements of approximately $17,000. Total income into the account during 2019 amounted to approximately $13,900. I did not see any transactions that appeared to be payroll.

30. Michigan businesses are required by law to provide a quarterly report to the State of Michigan Unemployment Insurance Agency (MIUIA) outlining all employees who earned wages during the quarter. The quarterly report includes the employees' name, social security number, and wages earned during that quarter. The MIUIA taxes businesses to fund unemployment compensation programs for eligible employees in Michigan. The MIUIA uses the quarterly reports to determine unemployment insurance taxes owed by businesses for each quarter.

31. A subpoena was issued to the MIUIA to obtain The Romero Group's

employment records. According to records produced by MIUIA, a search of their database utilizing The Romero Group's name and EIN number returned a result of "No Matches Found." MIUIA further informed IRS-CI that no compensation related records for The Romero Group were submitted to the agency from 2020 through 2025. Based on my training and experience and conversations with more experienced agents, any company paying employees and withholding proper employment taxes should have compensation records on file with the MIUIA.

32. IRS-CI requested State of Michigan income tax returns and return information from the Michigan Department of Treasury for The Romero Group. Records produced by the Michigan Department of Treasury reveal no state income tax returns were filed for The Romero Group for the tax years 2018 through 2024.

33. IRS-CI requested and obtained federal tax returns and return information from the Internal Revenue Service for The Romero Group. Records provided by the Internal Revenue Service revealed no business income tax returns were filed for The Romero Group for tax years 2018 through 2024.

34. IRS-CI also requested the Internal Revenue Service produce any Forms 941 filed for The Romero Group. IRS Form 941 is required to be filed by businesses to report their quarterly number of employees, wages paid, federal income tax withholdings, and other similar business expenses. Records provided by the Internal Revenue Service revealed no Forms 941 were filed on behalf of The Romero Group

for tax years 2018 through 2024.

35. Based on my training and experience and conversations with more experienced agents, and my analysis of bank records, loan documentation obtained from the SBA and Huntington Bank, and records reviewed from the State of Michigan, MIUIA, and Internal Revenue Service, there is probable cause that WILLIAMS fabricated or misrepresented the number of individuals employed by The Romero Group and the average payroll expenses for the business during the relevant period. This is significant because these figures were used to calculate the amount of money the business was eligible to receive under the PPP. There is probable cause that WILLIAMS also fabricated or misrepresented The Romero Group's gross receipts in the second quarter of 2019 and 2020. This is significant because these figures were a factor in determining The Romero Group's eligibility for the second draw loan it received.

36. On August 16, 2021, WILLIAMS applied to have The Romero Group's first draw loan forgiven. The application, electronically signed by WILLIAMS, stated The Romero Group had 23 employees and $900,995.13 in payroll costs from April 23, 2020 through October 7, 2020. To support the forgiveness application, WILLIAMS provided 2020 IRS Forms 941 purportedly for each quarter of 2020. A loan forgiveness report created by the SBA from information provided by WILLIAMS also listed 23 individuals and their purported payroll compensation for

the covered period. On September 8, 2021, the first draw loan was forgiven.

***<u>The Romero Group – Use of Loan Proceeds</u>***

37. SBA records indicate The Romero Group's first and second draw loans were to be used for payroll. I conducted an analysis of the activity in The Romero Group's bank account at Huntington Bank ending in x3425 from April 23, 2020, the date the PPP proceeds were first deposited into the account, through March 18, 2022, when the account balance dropped below $200. The following summarizes how WILLIAMS utilized The Romero Group's PPP loan proceeds totaling $696,270.

38. WILLIAMS used approximately $275,000 in PPP funds to purchase cashiers' checks that he ultimately deposited into other bank accounts at outside institutions in the name of The Romero Group and other businesses he owned and controlled. These funds appear to have been used to support WILLIAMS' personal spending, including towards daily expenses, luxury clothing, dining, furniture, home fitness equipment, and the purchase of a Rolls-Royce and down payment on a home.

39. WILLIAMS transferred approximately $383,376.57 in PPP funds to Paychex, Inc., a company that provides various services including payroll processing. Records produced by Paychex show that Paychex accounts associated with WILLIAMS' businesses were created on May 20, 2020, almost one month after he received The Romero Group's first draw loan. When the accounts were created, Paychex was provided with a list of individuals and companies that would be paid

as 1099 employees from the accounts, and none had been hired prior to January 1, 2020.

40. WILLIAMS transferred approximately $383,376.57 in PPP funds to the Paychex accounts over numerous transactions. Three of those transactions involving more than $10,000 in loan proceeds, including the following:

| Date | Amount | Type | Destination |
|---|---|---|---|
| 4/16/2021 | $42,855 | Debit - Paychex | Paychex |
| 4/23/2021 | $39,984 | Debit - Paychex | Paychex |
| 4/30/2021 | $42,224 | Debit - Paychex | Paychex |

41. From Paychex, WILLIAMS was paid approximately $333,642 to his personal account and three other businesses he owned and controlled and approximately $30,951 was paid to an individual who appears to be his close associate. Again, the funds transferred to WILLIAMS appear to have gone to support his personal spending, including towards peer-to-peer transfers, towards payments to American Express for exotic and luxury car rentals, clothing, dining, and rent payments on his apartment. Only approximately $18,784 was paid in small payments to eight individuals. The individuals paid through the Paychex accounts were not the same individuals identified as having been paid by The Romero Group in the supporting documents for its forgiveness application.

***<u>Step Ladder Construction – First Draw PPP Loan (May 4, 2020)</u>***

42. In 2011, Articles of Incorporation were filed establishing Step Ladder

Construction ("Step Ladder") with WILLIAMS listed as the registered agent. Step Ladder does not appear to have a website or social media but is referenced on The Romero Group's Facebook page.

43. On or around May 4, 2020, WILLIAMS submitted an SBA Form 2483 PPP Borrower Application to Huntington Bank on behalf of Step Ladder requesting a loan in the amount of $1,535,370. WILLIAMS electronically signed the application and initialed various certifications and authorizations including that the information provided in the application and all supporting documents and forms was true and accurate in all material respects.

44. In the application, WILLIAMS listed himself as the President of Step Ladder with 100% ownership. The application also asserted Step Ladder had 74 employees, the average monthly payroll was $614,148, and the loan would be used for payroll.

45. A 2019 IRS Form 941 was submitted with the application purported to show Step Ladder paid total quarterly payments of $1,959,447.31 to 79 employees for January, February, and March, with $336,594 in federal income tax withheld. The 2019 IRS Form 941 was signed by WILLIAMS as CEO.

46. Based on the above representations, the loan was approved and, on or about May 6, 2020, Step Ladder's Huntington account ending in x0213 received a $1,532,871 electronic deposit.

47. Huntington Bank records show that WILLIAMS opened the business checking account ending in x0213, titled for Step Ladder, on April 21, 2020. WILLIAMS is the sole signor listed for the account. This account was opened with a $200 deposit, and it maintained that balance until May 6, 2020, when the first draw loan proceeds were wired into the account.

***<u>Step Ladder Construction – Second Draw PPP Loan (March 3, 2021)</u>***

48. On or about March 1, 2021, WILLIAMS submitted an SBA Form 2483-SD PPP Second Draw Borrower Application, on behalf of Step Ladder to Huntington Bank requesting a second draw loan in the amount of $1,532,870. WILLIAMS electronically signed the application and initialed various certifications and authorizations including that the information provided in the application and all supporting documents and forms was true and accurate in all material respects.

49. In the application, WILLIAMS listed himself as the Chief Executive Officer with 100% ownership. The application also asserted Step Ladder had 72 employees, the average monthly payroll was $613,148, and the loan would be used for payroll. The application also reported that Step Ladder made $3,432,190 in gross receipts in the second quarter of 2019 and $2,432,560 in the second quarter of 2020.

50. Based on the above representations, the loan was approved and, on or about March 2, 2021, Step Ladder's Huntington account ending in x0213 received the second draw $1,532,870 electronic deposit.

51. A subpoena was issued to the MIUIA to obtain Step Ladder's employment records. According to records produced by MIUIA, a search of their database utilizing Step Ladder's name and EIN number showed that no compensation related records for Step Ladder were submitted to the agency from 2020 through 2025. Based on my training and experience and conversations with more experienced agents, any company paying employees and withholding proper employment taxes should have compensation records on file with the MIUIA.

52. IRS-CI requested State of Michigan income tax returns and return information from the Michigan Department of Treasury for Step Ladder. Records produced by the Michigan Department of Treasury reveal no state income tax returns were filed for Step Ladder for the tax years 2018 through 2024, aside from five monthly returns filed in 2019 that claimed $267 in state withholding in January and zero withheld in February through May.

53. IRS-CI requested and obtained federal tax returns and return information from the Internal Revenue Service for Step Ladder. Records provided by the Internal Revenue Service revealed that for tax year 2018, Step Ladder filed a Form 941 reporting quarterly wages paid to employees totaling only $11,146.25 for July, August, and September 2018. Otherwise, the IRS reported this entity filed no tax returns, including no other Forms 941.

54. Step Ladder's Huntington account ending in x0213 was not open until

2020. I conducted an analysis of disbursement and withdrawal activity during 2019 for Step Ladder's two other separate bank accounts that were open during the relevant period. The analysis revealed approximately $772,902 in income that appeared related to construction, rather than the $3,432,190 WILLIAMS represented in the application that Step Ladder made in gross receipts in just the second quarter of 2019. Further, I did not see any transactions that appeared to be payroll. Even peer-to-peer transactions from the accounts to individuals only amounted to approximately $92,906 and approximately $271,970 in checks were drawn on the account, rather than the $1,807,987.39 in payroll WILLIAMS represented in the application's supporting documents that Step Ladder paid in just one quarter of 2019.

55. Based on my training and experience and conversations with more experienced agents, and my analysis of bank records, loan documentation obtained from the SBA and Huntington Bank, and records reviewed from the State of Michigan, MIUIA, and Internal Revenue Service, there is probable cause that WILLIAMS fabricated and misrepresented the number of individuals employed by Step Ladder and the average payroll expenses for the business. This is significant because these figures were used to calculate the amount of money the business was eligible to receive under the PPP. There is probable cause that WILLIAMS also fabricated or misrepresented Step Ladder's gross receipts in the second quarter of

2019 and 2020. This is significant because these figures were a factor in determining Step Ladder's eligibility for the second draw loan it received.

56. On April 4, 2022, WILLIAMS applied to have Step Ladder's first draw loan forgiven. The application, electronically signed by WILLIAMS, stated Step Ladder had 78 employees and $3,222,044.82 in payroll costs from May 6, 2020 through October 20, 2020. To support the forgiveness application, WILLIAMS provided 2020 IRS Forms 941 purportedly for each quarter of 2020. A loan forgiveness report created by the SBA from information provided by WILLIAMS also listed 81 individuals and their purported payroll compensation for the covered period. On May 31, 2022, the first draw loan was forgiven.

***<u>Step Ladder – Use of Loan Proceeds</u>***

57. SBA records indicate the first and second draw loans were to be used for payroll. I conducted an analysis of the activity in Step Ladder's bank account ending in x0213 from May 6, 2020, the date the PPP proceeds were first deposited into the account, through July 10, 2024, when the account balance dropped below $200. The following summarizes how WILLIAMS utilized Step Ladder's $3,065,741 in total PPP loan proceeds.

58. WILLIAMS withdrew approximately $700,000 of the first draw loan funds and ultimately deposited the funds into another Step Ladder account he exclusively controlled. Aside from a few small cash withdrawals, WILLIAMS

transferred the remaining first draw loan funds to the Paychex accounts. He transferred all the second draw loan funds to the Paychex accounts, as shown in the following example transactions each involving more than $10,000 of loan proceeds:

| Date | Amount | Type | Destination |
|---|---|---|---|
| 4/16/2021 | $157,478 | Debit - Paychex | Paychex |
| 4/23/2021 | $160,969 | Debit - Paychex | Paychex |
| 5/6/2021 | $187,327 | Wire - Paychex | Paychex |

59. From Paychex, WILLIAMS was paid approximately $1,7,94,393 to himself and his other businesses, and more than approximately $376,262 was paid to three individuals who appear to be his relatives or close associates. Again, the funds transferred to WILLIAMS appear to be used for his personal benefit including towards daily expenses, luxury clothing retailers, dining, towards a down payment on a $2.4 million home, mortgage payments for said home, luxury vehicles, and yacht rentals. Approximately $69,237 was paid in small payments to six individuals and approximately $138,769 was paid to companies that appear related to construction. These individuals and companies were not the same as those identified as having been paid by Step Ladder during the relevant period in the supporting documents for the forgiveness application. Moreover, the amount paid to these individuals and companies was significantly less than the $3,065,741 Step Ladder received to pay its purported payroll expenses. There has also been no activity in the Paychex accounts since May 7, 2021, suggesting that WILLIAMS used the Paychex

accounts to facilitate fraudulent transfers of PPP funds to himself and close associates for personal gain, and not for any legitimate business purpose.

***Additional Loans***

60. The loans described above are not the only PPP loans received by WILLIAMS. My review of records obtained from the SBA and other SBA approved lenders revealed additional PPP loans linked to WILLIAMS. Based on the records, WILLIAMS received at least $5,200,611 in total PPP loan funds and retained more than $4.4 million. Like the transactions described above, much of the funds were used by WILLIAMS for his personal benefit, including to pay his credit card and other personal expenses or were transferred to his personal account.

**CONCLUSION**

61. Your affiant submits that there is probable cause to believe that WILLIAMS devised and perpetrated a scheme or artifice to defraud lender institutions and the SBA by submitting fraudulent PPP loan applications that contained material misrepresentations such as the number of employees, average payroll, or intended use of the funds. In furtherance of and to execute this scheme, WILLIAMS electronically signed and submitted the loan applications and other writings, signs, signals, and pictures in interstate commerce by means of wire communication, as set forth above. He also received the proceeds of the loans via electronic funds transfer wires that crossed state lines.

62. Further, your affiant submits that there is probable cause to believe WILLIAMS engaged in multiple monetary transactions, including those listed in the charts above, using more than $10,000 in proceeds from his wire fraud scheme, through a financial institution.

63. Therefore, your affiant believes that probable cause exists that RANDON WILLIAMS committed violations of 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1957 (money laundering).

Special Agent Annamarie Korte
IRS Criminal Investigation

Sworn to before me and signed in my presence and/or by reliable electronic means.

United States Magistrate Judge
David R. Grand
Eastern District of Michigan

Date: April 6, 2026